

# Missouri Court of Appeals

## Southern District

### In Division

STATE OF MISSOURI, )
)
             Respondent, )
) No. SD38194
    vs. )
) Filed: January 28, 2025
TIFFANY ANNE LUKASIEWICZ, )
)
             Appellant. )

### APPEAL FROM THE CIRCUIT COURT OF JASPER COUNTY

#### Honorable Gayle L. Crane, Judge

**AFFIRMED**

Tiffany Anne Lukasiewicz ("Defendant") appeals the decision of the trial court sentencing her to three consecutive life terms of imprisonment after a jury convicted her of second-degree murder under section 565.021,[1] first-degree arson under section 569.040, and first-degree domestic assault under section 565.072. In two points on appeal, Defendant argues that (1) the trial court erred in admitting Defendant's interview with law enforcement because it violated her privilege against self-incrimination under the Fifth Amendment because she had invoked her right to remain silent, and (2) the trial court erred in admitting Defendant's

---

[1] All statutory citations are to RSMo 2016, including, as applicable, statutory changes effective January 1, 2017.

subsequent interviews with law enforcement because her *Miranda*[2] warnings were rendered ineffective when law enforcement violated her Fifth Amendment right against self-incrimination in her first interview.

Finding no merit in Defendant's arguments, we affirm the trial court's judgment.

## Factual Background and Procedural History

Defendant resided with her stepmother (Stepmother) and father (Father). On December 3, 2020, after seeing Father with a cut on his face, Defendant accused Stepmother of beating Father. Defendant then called the police, who spoke with all three individuals and subsequently left without making an arrest. Around 3:30 a.m. on December 4, Stepmother woke up and saw that her chair in the living room was on fire. She yelled "fire" and went to where she normally kept the fire extinguisher, but it was no longer there. She then retrieved water from the kitchen and threw it on the fire but the fire had "gotten a lot bigger." As Stepmother was going to her bedroom to get her phone to call 911, she saw Defendant and Father standing in the hallway. Stepmother then heard Defendant and her twin sister (Twin Sister) outside, yelling for Father. Stepmother had "no idea" why Twin Sister would be at the house at such an early hour. The house had gotten "very smoky" and Stepmother tried to crawl toward Father, who was still in the hallway, but the fire prevented her from reaching him. She found herself by the kitchen side door, at which point a police officer grabbed her and carried her out of the house. Stepmother suffered severe injuries from the fire. Father died in the fire.

An investigation of the home after the fire led the fire marshal to believe the fire was not accidental, but rather set intentionally under suspicious circumstances. Outside of the home, law enforcement found a backpack and a laptop case containing various personal items belonging to

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

2

Defendant located under Defendant's open bedroom window.

On December 8, Defendant voluntarily went to the Joplin police department to pick up her personal belongings. Officer Wes Massey requested an interview and she agreed. When Defendant returned the next day, December 9, to pick up more of her personal belongings, Officer Massey administered *Miranda* warnings and recorded his interview with Defendant.[3] Officer Massey informed Defendant that she could "decide at any time to exercise these rights, not answer any questions or make any statements."

Defendant stated that the night of the fire Twin Sister told her that Stepmother had an "ass whooping coming to her." After Officer Luke Stahl joined the interview and asked Defendant some questions, Defendant told the officers she was "overwhelmed." The following conversation took place between Officer Stahl and Defendant:

| | |
|---|---|
| Officer Stahl: | I have a feeling you know exactly what happened. |
| Defendant: | Listen, [Stepmother] was supposed to have her butt beat. |
| Officer Stahl: | And somehow that was going to affect the garage? |
| Defendant: | No, will you please stop? |
| Officer Stahl: | As long as it's the truth I'll let you tell it to me. |
| Defendant: | Will you stop. |
| Officer Stahl: | As long as you tell me the truth, I'll stop. |
| Defendant: | [Stepmother] was supposed to have her ass beat and I guess they were, yeah, setting a fire in the back. I don't know who they are, they were going to set a fire in the alley to cause a diversion to get [Stepmother] out so she can get her ass beat and [Father] wouldn't get hurt. |

Officer Massey testified that he did not threaten Defendant or promise her anything during the interview, and nothing in the record indicates that law enforcement threatened or deceived Defendant, or even raised their voices during the interview. Defendant voluntarily left the police department at the end of the interview.

Defendant was arrested on December 10, placed in custody at the Newton County Jail

---

[3] Officer Massey later testified that he *Mirandized* Defendant at the time of this additional interview because he had received additional information that led him to believe Defendant "knew more than she was divulging."

and was interviewed by Officer Chip Root. After Officer Root re-administered *Miranda* warnings to Defendant, she told him that Twin Sister was supposed to start the fire in the alley and two other girls were supposed to start a fire in the basement. Defendant further told Officer Root that she texted Twin Sister the night of December 3 and told her that she wanted Stepmother's "ass beat." Defendant stated that Twin Sister formulated the plan to start a fire in the alley to create a diversion to draw Stepmother out of the house.

On December 11, Officer Root received a message from Defendant indicating that she wanted to speak with him again. Officer Root once again re-administered *Miranda* warnings to Defendant and she told him that after she texted Twin Sister, Defendant snuck Twin Sister into the house and Twin Sister eventually threw something towards the living room, catching the living room on fire. Both the interviews on December 10 and December 11 were audio recorded.

Defendant was charged with second-degree murder under section 565.021, first-degree arson under section 569.040, and first-degree domestic assault under section 565.072. Defendant filed a motion to suppress, arguing that law enforcement violated Defendant's Fifth Amendment rights by continuing the interrogation after she asked them to stop. Defendant further argued that the subsequent interrogations at the jail on December 10 and 11 should be suppressed because they were the "fruit of the poisonous tree" and tainted by Defendant's incriminating statements on December 9.

At a pre-trial hearing on Defendant's motion, Officer Stahl testified that law enforcement administered *Miranda* warnings on December 9 "just out of an abundance of caution." He further testified he continued to question Defendant after she said "will you stop" because he believed she was telling him to "stop the way [he] was asking the question in the interview" and he had no reason to believe she was terminating the interview at that point or exercising her

4

*Miranda* rights. Officer Massey testified that although the interview room was "a secured area" and locked from the outside, anyone could have exited the interview room without assistance from the inside. He further testified that Defendant was free to leave and walk out of the interview room at the police department at any time. After this testimony, the trial court took the motion under consideration and later overruled the motion to suppress without entering written findings of fact or conclusions of law.

At trial, Defendant's December 9 interview was marked as State's Exhibit 33, and Defendant's December 10 and 11 interviews were marked as State's Exhibit 34. Officer Massey testified concerning the statements Defendant made in the December 9 interview, and defense counsel made no objection. When the State offered both exhibits into evidence, defense counsel objected, raising the same arguments that he raised in his motion to suppress. The trial court in both instances overruled the objections and admitted the exhibits into evidence.

The jury convicted Defendant on all counts. The trial court sentenced Defendant as a prior and persistent offender to life in prison on each count, with each sentence running consecutively to the other sentences. Defendant filed a motion for new trial, arguing that admission of the statements Defendant made in all three interviews violated Defendant's right to be free from self-incrimination under the Fifth Amendment.[4] Defendant appealed.

## Discussion

### Point One

Defendant argues that the trial court erred in admitting State's Exhibit 33 into evidence because the exhibit contained Defendant's interview with law enforcement on December 9 in

---

[4] Because the record does not indicate whether the trial court denied the motion, in accordance with Supreme Court Rule 29.11(g) (2024), Defendant's motion for new trial was overruled by operation of law. *See **State v. Rainey**, 545 S.W.3d 916, 926 n.9 (Mo.App. 2018).

which they violated her privilege against self-incrimination under the Fifth Amendment by continuing the interrogation after she had told them to "please stop."[5]

"In reviewing the trial court's decision denying a motion to suppress, our review of the trial court's ruling on a motion to suppress evidence is limited to a determination of whether the evidence was sufficient to support the trial court's ruling." *State v. Hines*, 648 S.W.3d 822, 829 (Mo.App. 2022) (internal quotation marks omitted). "This Court reviews a trial court's ruling on a motion to suppress in the light most favorable to the ruling and defers to the trial court's determinations of credibility." *State v. Howland*, 576 S.W.3d 619, 620 (Mo.App. 2019) (internal quotation marks omitted).

> The [trial] court's ruling on a motion to suppress will not be reversed unless the decision was clearly erroneous. A ruling is clearly erroneous if the Court is left with a definite and firm belief a mistake has been made. Whether conduct violates the Fifth Amendment is a question of law and is given *de novo* review.

*State v. Rice*, 573 S.W.3d 53, 66 (Mo. banc 2019) (internal quotation marks omitted). "Upon review of a trial court's ruling on a motion to suppress, the court will consider all evidence presented at trial, as well as the evidence presented at the suppression hearing." *Hines*, 648 S.W.3d at 829. "Where, as here, the trial court makes no findings of fact in ruling on the motion to suppress, we presume the trial court found all facts in accordance with its ruling." *State v. Selvy*, 462 S.W.3d 756, 764 (Mo.App. 2015).

"The Fifth Amendment to the United States Constitution provides in [relevant] part, that no person . . . shall be compelled in any criminal case to be a witness against himself. U.S. Const. amend. V. This provision is applicable to the States in all criminal prosecutions." *State*

---

[5] The State argues that Defendant's point is unpreserved for appeal because defense counsel failed to object when Officer Massey testified concerning some of the statements Defendant made in the December 9 interview. Defendant also raised the same arguments in her motion for new trial and this appeal. Defendant on appeal does not argue that Officer Massey's testimony concerning Defendant's statements was improperly admitted. Accordingly, Defendant's point one is preserved for appeal.

*v. Sardeson*, 220 S.W.3d 458, 465 (Mo.App. 2005).

> The privilege against self-incrimination includes the requirement that the police warn those taken into custody that they have the right to remain silent. Custodial interrogation occurs either when a suspect is formally arrested or under any other circumstances where the suspect is deprived of his freedom of action in any significant way.

*State v. Werner*, 9 S.W.3d 590, 595 (Mo. banc 2000) (internal quotation marks omitted). "In deciding whether a suspect is in custody at a particular time, courts examine the extent of the restraints placed on the suspect during the interrogation in light of whether a reasonable person in the suspect's position would have understood the situation to be one of custody."

"Courts must examine all of the circumstances surrounding the interrogation to determine how a suspect would have gauged his freedom of movement." *State v. Stricklin*, 558 S.W.3d 54, 62 (Mo.App. 2018). "Our Supreme Court has identified several factors relevant to determining whether the totality of the circumstances establish that a suspect was in custody at the time of questioning." *State v. Wright*, 585 S.W.3d 360, 368 (Mo.App. 2019) (internal quotation marks omitted). These factors include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to answer questions;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether the atmosphere was police dominated; or,
>
> (6) whether the suspect was placed under arrest at the termination of questioning.

7

*Werner*, 9 S.W.3d at 595. "The list of factors a court may consider is not exhaustive, and their presence and absence merely guide courts in assessing the totality of the circumstances surrounding interrogations." *Stricklin*, 558 S.W.3d at 63. "The circumstances of each case influence the custody determination, but the ultimate inquiry is whether there is a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Id*.

The State argues Defendant was not in custody so "she could not have effectively invoked her constitutional right to silence." The State also argues "even if Defendant could invoke the constitutional right to silence outside of a custodial interrogation, she did not unambiguously do so." We need not address the State's second argument as their first argument is dispositive.

Defendant was not under formal arrest or deprived of her freedom of movement in any significant way before or during the December 9 interview. Officer Massey, after delivering cautionary *Miranda* warnings, assured Defendant that she could "decide at any time to exercise these rights, not answer any questions or make any statements." "The absence of police advisement that . . . the suspect is at liberty to decline to answer questions has been identified as an important indicium of the existence of a custodial setting. Where law enforcement officers have issued such an advisement, custody has frequently been found not to exist." *Werner*, 9 S.W.3d at 596 (internal quotation marks omitted). Before and during the interview, neither Officer Massey nor Officer Stahl informed Defendant that she was under arrest or was required to answer their questions.

Further, neither officer subjected Defendant to arrest-like restraints. Defendant was not handcuffed or otherwise restrained during the interview. Officer Massey testified that although the interview room was a "secured area" and locked from the outside, anyone could have exited

the interview room without assistance from the inside. He further testified that Defendant was free to leave and walk out of the interview room at the police department at any time. "If a person is free to go at any time prior to the actual arrest, then the person is not under arrest." **State v. Glass**, 136 S.W.3d 496, 509 (Mo. banc 2004) (internal quotation marks omitted). Defendant possessed unrestrained freedom of movement during questioning.

Defendant also initiated contact with authorities and voluntarily acquiesced to official requests to answer questions. On December 8, Defendant voluntarily went to the Joplin police department to pick up her personal belongings. Officer Wes Massey asked to interview her while she was there, and she agreed. The next day, Defendant returned to pick up more of her personal belongings, and Officer Massey again interviewed Defendant at the police department. Law enforcement did not seek out Defendant or bring her in for questioning on December 9 – rather, she went to the police department and voluntarily agreed to an interview with Officer Massey, just like she did the day before.

During the interview, neither officer employed strong-arm tactics or deceptive stratagems. Officer Massey testified that he did not threaten Defendant or promise Defendant anything during the interview, and nothing in the record indicates that law enforcement threatened or deceived Defendant, or even raised their voices during the interview. Finally, while Defendant was arrested after the interview the next day, under these circumstances the arrest "does not impact how a reasonable person would have viewed his opportunity to leave or terminate the interview beforehand[,]" **State v. Bruce**, 503 S.W.3d 354, 358 (Mo.App. 2016), as before, during, and immediately after the interview, Defendant was not arrested, otherwise detained, or threatened with arrest or detention.

The circumstances surrounding Defendant's December 9 interview indicate that

9

Defendant was not in custody, as Defendant was not subject to "a formal arrest or a restraint on freedom of movement of the degree associated with a formal arrest." *Stricklin*, 558 S.W.3d at 63. Accordingly, deferring to the trial court's determinations of credibility, we are not "left with a definite and firm belief a mistake has been made," and the trial court did not clearly err in denying Defendant's motion to suppress. *Rice*, 573 S.W.3d at 66 (internal quotation marks omitted).

Point one is denied.

Point Two

Defendant argues the trial court erred in admitting State's Exhibit 34 into evidence because the exhibit contained Defendant's subsequent interviews with law enforcement on December 10 and 11 in which Defendant's *Miranda* warnings were rendered ineffective because law enforcement violated her Fifth Amendment right against self-incrimination in her December 9 interview.

The State argues that Defendant's point is unpreserved for appeal, as Defendant in her motion to suppress argued, not that the December 10 and 11 *Miranda* warnings were ineffective, but that the subsequent interrogations at the jail should be suppressed because they were the "fruit of the poisonous tree" and tainted by the incriminating statements Defendant made on December 9. However, assuming without deciding that Defendant's point two is preserved for appeal, Defendant's argument is unpersuasive.

Exclusion of subsequent statements, made either in the same or subsequent interview or interrogation, based on a prior *Miranda* violation depends firstly upon whether a prior *Miranda* violation has in fact occurred. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985), *State v. Seibert*, 93 S.W.3d 700, 705 (Mo. banc 2002). Defendant was not in custody during her December 9

interview. Defendant does not argue that the *Miranda* warnings administered in her subsequent December 10 and 11 interviews were otherwise ineffective. Accordingly, because no prior *Miranda* violation occurred in Defendant's December 9 interview, the trial court did not err in determining the *Miranda* warnings administered in Defendant's December 10 and 11 interviews were effective.

Point two is denied.

### Decision

The trial court's judgment is affirmed.

BECKY J. WEST, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

MARY W. SHEFFIELD, J. – CONCURS